# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| JOSEPH GILBERT, JR. | : | |
| Plaintiff, | : | |
| | : | NO. 06-cv-4064 |
| v. | : | |
| | : | |
| PHILADELPHIA MEDIA HOLDINGS | : | |
| LLC,   and | : | |
| PHILADELPHIA NEWSPAPERS LLC | : | |
| Defendants. | : | |
| | : | |

## MEMORANDUM AND ORDER

June 26 , 2008                                                                 Anita B. Brody, J.

Joseph Gilbert, Jr. ("Gilbert"), an African-American man, has sued his employer,

Philadelphia Newspapers LLC and its successor in interest Philadelphia Media Holdings LLC

(collectively, the "Newspaper"), for race discrimination, retaliation, and racial harassment in

violation of the Civil Rights Act of 1866, 42 U.S.C. § 1981, and the Civil Rights Act of 1991,

Pub. L. 102-166, 105 Stat. 1071 (Nov. 21, 1991).[1]  Jurisdiction is proper under 28 U.S.C. § 1331.

---

[1]  Section 1981 plaintiffs need not satisfy the Equal Employment Opportunity
Commission filing requirements imposed on Title VII plaintiffs.  CBOCS West, Inc. v.
Humphries, 128 S.Ct. 1951 1959-60 (2008).  Despite the differences between § 1981 and Title
VII, the methods of analysis are similar.  Notably, Congress intended for these statutes to
overlap: "legislative enactments in this area have long evinced a general intent to accord parallel
or overlapping remedies against discrimination."  Id. at 1960 citing Alexander v. Gardner-Denver
Co., 415 U.S. 36, 47 (1974).

### I. Legal Standard for Summary Judgment

Gilbert, an African-American man, claims that the Newspaper discriminated and retaliated against him and harassed him based upon his race in violation of 42 U.S.C. § 1981. The Newspaper moved for summary judgment, arguing that: (1) it has articulated legitimate non-discriminatory reasons for all alleged adverse employment actions and Gilbert has not met his burden to demonstrate that the articulated reasons are merely pretext for discrimination; (2) it has articulated legitimate non-discriminatory reasons for all alleged adverse employment actions and Gilbert has not met his burden to demonstrate that the articulated reasons are merely pretext for retaliation; and (3) Gilbert has not made a prima facie case for racial harassment.

Summary judgment must be granted if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). Facts are material if they might affect the outcome of the case. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A genuine issue of fact exists when the evidence is such that a reasonable jury could return a verdict in favor of the non-moving party. Id. at 248-52. "[C]redibility determinations, the weighing of evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge. . . ." Id. at 255.

For purposes of summary judgment, "the nonmoving party's evidence 'is to be believed, and all justifiable inferences are to be drawn in [the nonmoving party's] favor.'" Hunt v. Cromartie, 526 U.S. 541, 552 (1999) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986)). Here, the facts are stated in the light most favorable to Gilbert, and all reasonable

inferences are drawn in Gilbert's favor.  The particular facts of each alleged adverse employment action and the Newspaper's legitimate, non-discriminatory reasons are discussed separately in the discussion section below.

## II.  Legal Standard for § 1981 Discrimination Claim

Section 1981 discrimination claims are analyzed using the McDonnell Douglas burden shifting scheme.  Pamintuan v. Nanticoke Memorial Hosp., 192 F.3d 378, 385 (3d Cir. 1999). To establish a prima facie case for race discrimination under the McDonnell Douglas test, a plaintiff must demonstrate that: (1) he or she belongs to a protected class; (2) he or she was qualified for the position; (3) he or she was subject to an adverse employment action despite being qualified; and (4) the adverse employment action occurred under circumstances that give rise to an inference of discrimination.  McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-03 (1973); Jones v. School Dist. of Phila., 198 F.3d 403, 410 (3d Cir. 1999).

After establishing a prima facie case, the burden shifts to the defendant employer to articulate a legitimate, non-discriminatory reason for taking the adverse employment action. Fuentes v. Perski, 32 F.3d 759, 763 (3d Cir. 1994).  This is a "relatively light" burden for the defendants, and if met, the burden shifts back to the plaintiff who must demonstrate that the defendant's explanation is merely pretext.  Id.  To survive a motion for summary judgment when the defendant offers a legitimate, non-discriminatory reason for its actions, the plaintiff must point to some evidence, direct or circumstantial, from which a fact finder could reasonably find by a preponderance of the evidence that the employer's proffered reasons are false or pretextual. Fasold v. Justice, 409 F.3d 178, 184 (3d Cir. 2005).  This means that the fact finder must either: (1) "disbelieve the employer's articulated legitimate reasons," finding them to be post hoc

fabrications or otherwise not really motivating the employment action; or (2) "believe that an

invidious discriminatory reason was more likely than not a motivating or determinative cause of

the employer's action."  Fuentes, 32 F.3d at 764.

A plaintiff who seeks to prove pretext through the first method outlined in Fuentes must

show "not merely that the employer's proffered reason was wrong, but that it was so plainly

wrong that it cannot have been the employer's real reason."  Keller v. Orix Credit Alliance, 130

F.3d 1101, 1109 (3d Cir. 1997).  A plaintiff must "demonstrate such weaknesses,

implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered

legitimate reasons for its action that a reasonable factfinder *could* rationally find them unworthy

of credence and hence infer that the employer did not act for the asserted non-discriminatory

reasons."  Fuentes, 32 F.3d at 765 (citations omitted, emphasis in original).

Alternatively, through the second method outlined in Fuentes to prove that the

defendant's proffered legitimate and non-discriminatory reason is merely pretext, a plaintiff

could show that invidious discrimination was more likely than not a motivating or determinative

factor in the defendant's adverse employment action.  Fuentes, 32 F.3d at 764.  That means that,

> [T]he plaintiff must point to evidence with sufficient probative
> force that a factfinder could conclude by a preponderance of the
> evidence that [race] was a motivating or determinative factor in the
> employment decision.  For example, the plaintiff may show that
> the employer has previously discriminated against [him or her],
> that the employer had discriminated against other persons within
> the plaintiff's protected class or within another protected class, or
> that the employer has treated more favorably similarly situated
> persons not within the protected class.

Simpson v. Kay Jewelers, Div. of Sterling, Inc., 142 F.3d 639, 644-45 (3d Cir. 1998).

### III. Discussion of § 1981 Discrimination Claim

In 1994, Gilbert began working for the Newspaper as an Account Executive selling advertisement space. Gilbert worked in that capacity for approximately nine years. In June 2003, Gilbert was promoted to the position of National Account Sales Representative ("NASR").

Between 1999 and 2002, before Gilbert's promotion, the Newspaper lost some of its advertising market share. Because of this loss of market share, the Newspaper implemented a "Growth Plan" to restructure the Newspaper's advertising sales approach. The Growth Plan was implemented after Gilbert's promotion. As a result of the Growth Plan's implementation, some of the Newspaper's employment practices changed.

Gilbert claims that after he was promoted to be a NASR and after the Growth Plan was implemented, the Newspaper took three adverse employment actions against him that were discriminatory: (1) Newspaper executives transferred some of Gilbert's advertising accounts to Caucasian representatives; (2) the Newspaper converted Gilbert's compensation scheme from commission to salary; and (3) the Newspaper disciplined and warned Gilbert.

In response, the Newspaper proffers a legitimate, non-discriminatory reason for each alleged adverse employment action: (1) some of Gilbert's advertising accounts were transferred as a part of the Newspaper's Growth Plan because Gilbert was earning more commission than the Plan allotted; (2) Gilbert's compensation scheme was converted to salary for business reasons; and (3) Gilbert was disciplined and warned because of his poor performance.

The Newspaper concedes that Gilbert established his prima facie case for his discrimination claim. The issue is whether the Newspaper proffered legitimate, non-discriminatory reasons for each alleged adverse employment action and if so, whether Gilbert can

demonstrate that these reasons are merely pretext.  Each adverse action is analyzed separately to see if the Newspaper has provided legitimate, non-discriminatory reasons and if Gilbert has shown that the Newspaper's proffered reasons are merely pretext for discrimination.

**(i) Transfer of Accounts**

Gilbert first claims that the Newspaper discriminated and retaliated against him by transferring some of his advertising accounts to Caucasian representatives.  Gilbert argues that two Caucasian Newspaper advertising executives, Steve Lauber and Doug Burke, redirected these accounts to Caucasian representatives to "prevent [him] from earning commissions," (Gilbert, page 47, lines 11-12), and that the removal of these accounts made Gilbert lose thousands of dollars in commission because of his race.

The Newspaper responds that its Growth Plan provided that someone in the National Account Sales Representative ("NASR") position should earn between $80,000 and $160,000 in commission annually in 2003, 2004, and 2005.  (Defendant's Exhibit #12).  After his promotion to the NASR position, Gilbert far exceeded $160,000, earning commissions of $236,897 in 2004 and $287,789 in 2005.  To keep Gilbert's commission between $80,000 and $160,000, the Newspaper transferred some of Gilbert's accounts to other representatives.  For example, in April 2006, Gilbert's Panasonic account was reassigned to Patrick Hernisey, a Caucasian NASR, and in May 2006, half of Gilbert's political advertising accounts were transferred to Ellen Eckstein, a Caucasian NASR.

The Newspaper argues that it transferred some of Gilbert's accounts legitimately and without discrimination to keep his commission within the Growth Plan's predetermined range. The Newspaper contends that its reason for transferring some of Gilbert's accounts had nothing

6

to do with race and everything to do with business planning.  The Newspaper's stated reason for

removing some of Gilbert's accounts meets the relatively light burden for a legitimate and non-

discriminatory reason.  Therefore, the analysis then moves to whether Gilbert has demonstrated

that this reason is merely pretext.

Gilbert argues that the Newspaper's reason is pretext because the Newspaper did not have

a predetermined $160,000 salary cap.  He points out that the NASR job description and the

posting for the position did not contain a cap.  The Growth Plan listed the $80,000 to $160,000

range as "Assigned Compensation" and it is not clear that the $160,000 is a maximum cap on

NASR commission.  Additionally, the Growth Plan's Frequently Asked Questions addressed

whether there is a maximum revenue potential or compensation:

> There is no maximum on sales representative's revenue generation
> or the associated compensation, within the guidelines of the comp
> plans and incentive programs.  As is currently the case, any
> commission rep with an account generating over $500,000 in a
> calendar year must transfer that account to a salaried rep.

(Plaintiff's Exhibit Z).  There is no indication that Gilbert's accounts were transferred because

they generated over $500,000 in a calendar year.  Gilbert argues that the real reason behind the

transfer of these accounts is that the Newspaper could not handle an African-American employee

earning such a high commission.

To support his contention that the Newspaper's reasons are merely pretext, Gilbert alleges

that Doug Burke, a National Director who reassigned some of Gilbert's accounts, made racist

remarks.  Specifically, Burke told Gilbert that Burke's nickname is "Bubba," that Burke

explained means "redneck."  Gilbert construes this as a racist remark because "growing up in

Philadelphia, anyone who characterized themselves as a redneck would be someone who's not

necessarily a friend to an African-American, to the African-American race historically speaking."

(Gilbert, page 83, lines 17-18 & 20-23).  Gilbert also contends that Burke made a racist remark

about Gilbert's wife and her ability to speak Spanish.  Gilbert argues that Burke's racist remarks

show that it is reasonable to infer that his race was a motivating factor in the decisions to transfer

his accounts.

The Newspaper responds that any remarks made by Newspaper employees are not

evidence that their legitimate, non-discriminatory reason for transferring some of Gilbert's

accounts is pretext for discrimination.  First, the Newspaper argues that Burke's remarks were

not racist.  Second, the Newspaper contends that Burke's remarks are merely stray remarks.  In

Ezold v. Wolf, Block, Solis-Cohen, 983 F.2d 509, 545 (3d Cir. 1992), the Third Circuit

explained that stray remarks by non-decision makers are inadequate to support an inference of

discrimination, particularly where such statements are made in a context removed from the actual

decision making process.  However, in some instances, remarks removed in time from the

adverse employment action may still be considered as evidence of pretext.  See Ryder v.

Westinghouse, 128 F.3d 128 (3d Cir. 1997).  Such remarks could be relevant to determining

whether there was a discriminatory corporate culture.  Id. at 133.

I find that a genuine issue of material fact remains as to whether the Newspaper's

legitimate non-discriminatory reason that it transferred some of Gilbert's accounts to keep his

commission within a predetermined non-race-based range is merely pretext for discrimination.

The Newspaper has not explained why it is in their business interest to transfer commission-

generating accounts from Gilbert, an African-American representative, to other representatives

who are Caucasian.  Also, Gilbert did not know about the allegedly predetermined salary cap.

Therefore, summary judgment is denied.

**(ii) Changed Compensation Scheme**

Gilbert claims that the Newspaper discriminated and retaliated against him by changing

his compensation from commission to salary because of his race.  In December 2005, the

Newspaper gave Gilbert, another African-American NASR, and two Caucasian NASRs the

choice to either switch to a salary compensation scheme and keep their title or to keep their

commission compensation scheme and take a new title.  In January 2006, all four of the NASRs

chose to change to a salary compensation scheme, including the two Caucasian representatives.

The Newspaper explains that it gave the four NASRs the choice to either keep their title

or to keep their commission-based compensations scheme as a part of the Newspaper's

reevaluation of its business practices.  The Newspaper explains that the Growth Plan was not as

successful as the Newspaper had hoped it would be, so the Newspaper continued to streamline its

business structure to lower costs and regain some market share.  The change in the NASRs'

compensation or title was a part of this streamlining process.  This explanation meets the

Newspaper's relatively light burden for stating a legitimate non-discriminatory reason for

changing Gilbert's compensation to salary.  The inquiry now moves to whether Gilbert has

established that this reason is merely pretext.

Gilbert argues that the Newspaper's explanation that the change in his compensation

scheme was part of a business plan is merely pretext because the Newspaper wanted to prevent

an African-American individual from earning such a high commission.  Gilbert relies on a

comment by Peter Ricker, the Vice President of Advertising, to show that the Newspaper's

explanation is pretext.  Ricker referred to Gilbert as a "superfeeder."  Gilbert understood "superfeeder" to mean "[s]omeone feeding off the company as a leech." (Gilbert, page 70, lines 17-18).  Howard Griffen, a Director of National Advertising, explained that Ricker used "superfeeder" to mean, "sales reps that were looking for opportunities, you know, that were good at taking categories and trying to grow them . . . [Ricker] used ['superfeeder'] with many reps.  It wasn't just specifically Mr. Gilbert." (Griffen, pages 90-91).

Gilbert's reliance on Ricker's remark that Gilbert was a "superfeeder" is insufficient evidence to create a genuine issue of material fact as to whether the Newspaper's legitimate non-discriminatory reason is false or merely pretext.  Gilbert was given the same choice that another African-American and two Caucasian employees were given.  Gilbert and these three other employees all chose to switch to a salary-based compensation scheme.  Gilbert has not provided any evidence to differentiate his change in compensation from that of the other NASRs.  Also Gilbert has not provided evidence to support a connection between the "superfeeder" comment and the change in his compensation.  Therefore, I find that a reasonable fact finder could not conclude that the Newspaper's business-based explanation is merely a post hoc fabrication or that discrimination was more likely than not a motivating or determinative factor in changing the compensation scheme.  Therefore, the Newspaper's motion for summary judgment is granted on this alleged adverse employment action.

**(iii) Discipline and Warnings**

Gilbert claims that the Newspaper discriminated and retaliated against him by disciplining and warning him because of race.  It is undisputed that sales representatives were put on a Performance Improvement Plan ("PIP") if they did not have a satisfactory job performance.

A sales representative could be terminated if he or she did not show sufficient progress after receiving a PIP for four consecutive months.  Unbeknownst to Gilbert, Steve Lauber, the Associate Director of National Advertising, put him on two PIPs: one in February and one in March of 2006.  Around the same time, Lauber placed eight Caucasian NASRs on PIPs and he eventually terminated five of those eight Caucasian NASRs for poor performance.  Lauber did not recommend that Gilbert be terminated for performance reasons.

Gilbert received other types of discipline and warnings as well.  For example, Gilbert received written warnings for improperly placing "legal ads."  The Newspaper had a policy that legal ads should only be placed by the Classified department.  Despite this policy, Gilbert placed three legal ads himself.  After the placement of each legal ad, Gilbert was told that legal ads should be placed by the Classified department.  Gilbert knew about the Newspaper's policy, but he placed these ads himself because he believed they were not legal ads.

The Newspaper argues that it disciplined and warned Gilbert legitimately and without discrimination because he performed poorly and he did not follow the Newspaper's policies.  The Newspaper explains that it disciplined and warned Gilbert because he did not satisfy the requirements of his position and he did not follow company policy, as is demonstrated by the legal ad issue.  This explanation satisfies the Newspaper's relatively light burden for setting out a legitimate non-discriminatory reason.  The inquiry now moves to whether Gilbert has established that the Newspaper's stated reason is pretext.

Gilbert argues that the Newspaper's stated reason is merely pretext for discrimination because he did not perform poorly.  Gilbert disputes the particular factual details of each instance of discipline.  First, Gilbert argues that he was never informed about two "undated, secret

disciplinary memoranda relied upon by defendant," presumably the PIPs.  If Gilbert received four

PIPs, he would have been at risk for termination.  He argues that the executives did not tell him

about the PIPs because he is African-American and the executives wanted to put him at greater

risk for termination.  Gilbert also maintains that he performed well and that any PIP would not

have accurately reflected his performance.  Second, Gilbert maintains that he followed the

Newspaper's legal ad policy and that he did not place ads that should have been placed by the

Classified department.  Gilbert argues that while the Newspaper disciplined him for allegedly

misplacing legal ads, it did not discipline Caucasian representatives when they placed

advertisements that were arguably legal ads.

From the evidence presented, it is unclear whether Gilbert performed poorly and did not

follow the Newspaper's policies.  On the one hand, Gilbert was earning such high commissions

that the Newspaper transferred some of his accounts to other representatives, but on the other

hand, Gilbert supposedly performed poorly.  Gilbert has produced sufficient evidence that he was

successful at the Newspaper, thus making the Newspaper's performance-based explanation

inconsistent.  Therefore, genuine issues of material fact remain as to whether the Newspaper's

legitimate non-discriminatory reasons for disciplining and warning Gilbert are merely pretext and

summary judgment is denied.

## IV.  Retaliation Claim

Section 1981 retaliation claims are analyzed similarly to Title VII retaliation claims.

Cardenas v. Massey, 269 F.3d 251, 263 (3d Cir. 2001).  To establish a prima facie case of

retaliation a plaintiff must show that: (1) he engaged in a protected activity; (2) he suffered an

adverse employment action; and (3) there was a causal connection between the protected activity

and the adverse employment action.  Weston v. Commonwealth of Pa., 251 F.3d 420, 430 (3d

Cir. 2001).  Protected activity includes "formal charges of discrimination as well as informal

protests of discriminatory employment practices, including making complaints to management."

Barber v. CSX Distribution Servs., 68 F.3d 694, 701-02 (3d Cir. 1995).  Once the plaintiff makes

a prima facie case of retaliation, the employer must then produce evidence that it imposed the

adverse employment action for legitimate reasons.  Moore v. City of Philadelphia, 461 F.3d 331,

342 (3d Cir. 2006).  Like in the discrimination context, the plaintiff must then provide evidence

that casts substantial doubt on the employer's reasons that would support a jury finding that the

reasons are merely pretext for retaliation.  Id.

  The Newspaper concedes that Gilbert established his prima facie case for his retaliation

claim.  Gilbert alleges that the Newspaper retaliated against him because while he was employed

by the Newspaper, he complained to management that he was being racially discriminated

against.  Gilbert alleges that the Newspaper took three adverse actions against him: (i) the

Newspaper transferred some of Gilbert's accounts to other representatives; (ii) the Newspaper

changed Gilbert's compensation scheme; and (iii) the Newspaper disciplined Gilbert.  Again, as

in a claim for discrimination, the question for retaliation becomes whether the Newspaper

proffered legitimate, non-discriminatory reasons for each alleged adverse employment action and

if so, whether Gilbert can demonstrate that these reasons are merely pretext.  Because the burden

shifting schemes for discrimination and retaliation are similar, the analysis of the Newspaper's

legitimate non-discriminatory reasons and Gilbert's showing of pretext for retaliation are the

same as they were for discrimination.

Accordingly, I adopt my analysis from the discrimination discussion.  As such, for

Gilbert's retaliation claim: (i) summary judgment is denied as to the transfer of Gilbert's

accounts; (ii) summary judgment is granted as to the change in Gilbert's compensation scheme;

and (iii) summary judgment is denied as to Gilbert's discipline and warnings.

*V.  Racial Harassment Claim*

Gilbert claims that he was racially harassed by the Newspaper.  A § 1981 racial

harassment claim can be analyzed using the Title VII hostile work environment framework.  See

CBOCS West, Inc. v. Humphries, 128 S.Ct. 1951 (2008) (finding that post-contractual

allegations are actionable under § 1981 and intentionally overlap Title VII analysis).  See also

Verdin v. Weeks Marine Inc., 124 Fed. Appx. 92, 96 (3d Cir. 2005) (not reported) (finding that

"we use the same analysis in assessing the substantive merit of the claims" for § 1981 racial

harassment and Title VII hostile work environment claims).  Therefore, to establish a prima facie

case for racial harassment under § 1981, a plaintiff must show that: (1) he or she suffered

intentional discrimination because of race; (2) the discrimination was pervasive and regular; (3)

the discrimination detrimentally affected the plaintiff; (4) the discrimination would detrimentally

affect a reasonable person of the same race in that position; and (5) respondeat superior liability

existed.  Andreoli v. Gates, 482 F.3d 641, 643 (3d Cir. 2007).  The only prong of the prima facie

case for racial harassment that the Newspaper seems to contest is the fifth prong, whether it – as

the employer – had respondeat superior liability.  Respondeat superior liability is automatically

proven if the employer takes a tangible employment action.  See Burlington Industries, Inc. v.

Ellerth, 524 U.S. 742, 765 (1998).  "A tangible employment action constitutes a significant

change in employment status, such as hiring, firing, failing to promote, reassignment with

significantly different responsibilities, or a decision causing a significant change in benefits." Id.

at 759.

Gilbert can establish the fifth prong of the racial harassment prima facie case –

respondeat superior liability – by showing that he suffered a direct tangible employment action.

Namely, that the Newspaper removed some of Gilbert's advertising accounts or disciplined and

warned him because of his race.  It is undisputed that the removal of some of Gilbert's

advertising accounts significantly lowered his compensation.  Therefore, Gilbert suffered a

tangible employment action and he has satisfied the fifth prong of the prima facie racial

harassment case.  Accordingly, the Newspaper's motion for summary judgment as to Gilbert's

racial harassment claim is denied.[2]

---

[2]  Both parties argue constructive discharge as if it is an independent claim.  Constructive
discharge, however, is not an independent claim – it is a type of adverse employment action that
may comprise part of a racial harassment claim.  Specifically, constructive discharge can be the
basis of respondeat superior liability for a racial harassment claim.  See Pennsylvania State
Police v. Suders, 542 U.S. 129, 148-52 (2004).  Here, Gilbert claims that the Newspaper
constructively discharged him.
    Even in the racial harassment context, I find that Gilbert has not demonstrated that he was
constructively discharged.  An employee is constructively discharged when an employer's
"calculated efforts" pressure the employee into resigning "through the imposition of
unreasonably harsh conditions, in excess of those faced by [the employee's] co-workers." Gray
v. York Newspapers, Inc., 957 F.2d 1070, 1082 (3d Cir. 1992).  Constructive discharge occurs
when an employer knowingly permits conditions of discrimination in employment so intolerable
that a reasonable person subject to them would resign. Spencer v. Wal-Mart Stores, Inc., 469
F.3d 311, 316 n.4 (3d Cir. 2006).  "Intolerability is assessed by the objective standard of whether
a 'reasonable person' in the employee's position would have felt *compelled* to resign – that is,
whether he would have had no choice but to resign." Connors v. Chryslter Fin. Corp., 160 F.3d
971, 976 (3d Cir. 1998) (citations omitted, emphasis in original).
    Despite Gilbert's allegations, the evidence does not support his argument that he was
subject to unreasonably harsh employment conditions.  In Gilbert's retirement e-mail when he
left he wrote: "Thank you very much for the privilege and opportunity to have served the
company in a loyal and productive manner for over 12 years."  This is not the language of
someone who was forced to suffer through working conditions that were objectively so
unpleasant or difficult that a reasonable person in the employee's shoes would have no choice

---

other than to resign.  Additionally, the evidence indicates that the Newspaper worked with Gilbert to try and find him a productive and comfortable working environment and that Gilbert chose the Daily News position.  Gilbert provides no evidence that he suffered through intolerable work conditions at the Daily News or that the Newspaper knew of any intolerable work conditions.  Therefore, I find that Gilbert has not presented sufficient evidence to create a genuine issue of material fact as to whether he was constructively discharged and that cannot be argued at trial.

## ORDER

**AND NOW**, this 26<u>th</u>  day of June, 2008, it is **ORDERED** that the Defendants' Motion

for Summary Judgment (Doc. #34) is **GRANTED** in part and **DENIED** in part:

- Defendant's Motion for Summary Judgment as to Gilbert's Discrimination and Retaliation Claims based on the transfer of Gilbert's accounts is **DENIED**;

- Defendant's Motion for Summary Judgment as to Gilbert's Discrimination and Retaliation Claims based on the switch from commission to salary is **GRANTED**;

- Defendant's Motion for Summary Judgment as to Gilbert's Discrimination and Retaliation Claims based on the discipline is **DENIED**;

- Defendant's Motion for Summary Judgment as to Gilbert's Racial Harassment Claim is **DENIED**.

- Defendant's Motion for Summary Judgment as to Constructive Discharge is **GRANTED**.

Anita B. Brody

ANITA B. BRODY, J.

Copies **VIA ECF** on _____ to:        Copies **MAILED** on _____ to:

17